**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MANTAS ŠIMAITIS, derivatively on behalf of BLUEBIRD BIO, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>ANDREW OBENSHAIN, CHRISTOPHER KRAWTSCHUK, RICHARD A. COLVIN, JOHN O. AGWUNOBI, CHARLOTTE JONES-BURTON, ELISABETH LEIDERMAN, NICK LESCHLY, RICHARD PAULSON, NAJOH TITA-REID, and MARK VACHON,<br><br>Defendants,<br><br>and<br><br>BLUEBIRD BIO, INC.,<br><br>Nominal Defendant. | Case No.: 1:24-cv-11674<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Mantas Šimaitis ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant bluebird bio, Inc. ("bluebird" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Andrew Obenshain ("Obenshain"), Christopher Krawtschuk ("Krawtschuk"), Richard A. Colvin ("Colvin"), John O. Agwunobi ("Agwunobi"), Charlotte Jones-Burton ("Jones"), Elisabeth Leiderman, M.D. ("Leiderman"), Nick Leschly ("Leschly"), Richard Paulson ("Paulson"), Najoh Tita-Reid ("Tita"), and Mark Vachon ("Vachon") (collectively, the "Individual Defendants," and together with

bluebird, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of bluebird, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Obenshain, Krawtschuk, and Colvin for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding bluebird, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by bluebird's current and/or former directors and officers from April 24, 2023 through December 8, 2023, both dates inclusive (the "Relevant Period").

2. Founded on April 16, 1992, bluebird is a biotechnology company incorporated in Delaware and based in Somerville, Massachusetts. The Company is known for creating, commercializing, and studying gene therapies for severe genetic disorders. bluebird's main purpose is to, "develop[] and deliver[] new therapies for severe genetic diseases that currently have limited or no treatment options. Our goal is to provide hope for a better life . . . for patients and their families." Furthermore, the Company has several products for different genetic disorders

including, ZYNTEGLO (betibeglogene autotemcel) ("Zynteglo") for the treatment of transfusion dependent ß thalassemia; LYFGENIA (lovotibeglogene autotemcel) ("Lyfgenia") for the treatment of sickle cell disease ("SCD"); and SKYSONA (elivaldogene autotemcel) ("Skysona") for the treatment of cerebral adrenoleukodystrophy ("CALD").

3. On August 17, 2022, the U.S. Food and Drug Administration ("FDA") approved Zynteglo for treating children and adults living with ß thalassemia who need regular red blood transfusions.

4. One month later, on September 17, 2022, the FDA granted accelerated approval of Skysona, bluebird's drug that slows down the development of neurological dysfunction in male pediatric patients aged 4-17 years old with CALD. Bluebird purports that the Company became a "leading commercial gene therapy company" after the FDA approved Zynteglo and Skysona.

5. On April 24, 2023, bluebird made public that it had applied to the FDA for a Biologics License ("BLA") for the lovotibeglogene autotemcel ("lovo-cel") gene therapy for patients 12 and older with SCD with a history of vaso-occlusive events ("VOEs"). Additionally, the Company requested, as a part of this application, priority review by the FDA. Priority review would shorten the review of the application to 6 months from the time of filing, versus the normal timeline for review, which is 10 months.

6. On November 7, 2023, the Company held an earnings call for the third quarter of the fiscal year ending December 31, 2023 (the "2023 Fiscal Year"). During the call, Defendant Obenshain stated information about the launch of lovo-cel and about the FDA not providing an Advisory Committee meeting. Specifically, Defendant Obenshain stated, in relevant part:

> I'm excited today to update you on bluebird's Q3 results and our preparations for the potential upcoming FDA approval of lovo-cel. . . . We believe the fact that the FDA Advisory Committee wasn't requested for lovocel ***is a testament to the***

> ***breadth and the depth of the lovo-cel data***[1] significantly more than any other gene therapy program for sickle cell disease.

7. Additionally, on this same conference call, Defendant Krawtschuk echoed that the Company had entered into an advanced agreement to see the priority review voucher, which was anticipated to be approved by the FDA. In relevant part, Defendant Krawtschuk stated:

> Additionally, last week, ***we announced that we've entered into an advanced agreement to sell a priority review voucher***, if granted, for lovocel for sickle cell disease for $103 million. This would be an important source of non-dilutive capital and has the potential to strengthen our financial position ahead of the anticipated launch of lovo-cel.

8. However, these statements were materially false and misleading. In reality, the Company misrepresented to investors that its new drug for SCD, Lyfegnia, was going to receive FDA approval without a black box warning and the FDA would grant its priority review request.

9. The truth emerged on December 8, 2023, when bluebird published a press release stating it received FDA approval for Lyfgenia. This approval came with a 'black box warning' for hematological malignancies and with a requirement to monitor patients for cancer through complete blood counts at the minimum every six months for at least 15 years. Additionally, it required a viral vector integration site analysis at month 6, 12, and as necessary. Moreover, the priority review voucher for the BLA was denied by the FDA.

10. On this news, the price of the Company's common stock declined from a closing market price of $4.81 per share on December 7, 2023, to $2.86 per share on December 8, 2023, or ***approximately 41%***.

11. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to bluebird, willfully or recklessly made and/or caused the Company to make false

---

[1] Unless otherwise noted, all emphasis in bold and italics herein after is added.

and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the FDA would not approve lovo-cel gene therapy without a black box warning for haematological malignancies; (2) the Company would not obtain a priority review voucher from the FDA for lovo-cel and, consequently, could not sell lovo-cel to reinforce bluebird's financial position before lovo-cel débuted; (3) as a result, Lyfgenia's commercial and/or clinical forecasts were materially exaggerated and overstated; (4) the Company failed to maintain internal controls; and (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the Company's 2023 Incentive Award Plan (the "2023 Incentive Plan"). As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

12. Moreover, three of the Individual Defendants further breached their fiduciary duties by engaging in lucrative insider sales of Company common stock at artificially inflated prices, obtaining aggregate approximate proceeds of $89,930.

13. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its former Chief Financial Officer ("CFO"), and its Chief Medical Officer ("CMO") to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Massachusetts (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due

to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

15. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the Company's directors' receipt of material benefits due to the approval of the 2023 Incentive Plan, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendant Obenshain's, Krawtschuk's and Colvin's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Company is headquartered in this District.

## PARTIES

**Plaintiff**

21. Plaintiff is a current shareholder of bluebird. Plaintiff has continuously held bluebird common stock since January 3, 2023.

**Nominal Defendant bluebird**

22. bluebird is a Delaware corporation with its principal executive offices at 455 Grand Union Boulevard, Somerville, Massachusetts 02145. bluebird's common stock trades on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "BLUE."

**Defendant Obenshain**

23. Defendant Obenshain has served as a Company director since 2021 and has served as the Company's President and CEO since November 2021. Previously, Defendant Obenshain served as bluebird's President, Severe Genetic Diseases from August 2020 until November 2021, and as bluebird's Senior Vice President, Head of Europe from 2016 until August 2020. According to the Company's proxy statement filed with the SEC on April 28, 2023 (the "2023 Proxy Statement"), Defendant Obenshain beneficially owned 535,647 shares of the Company's common

stock as of April 24, 2023. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023 was $3.44, Defendant Obenshain owned approximately $1.8 million worth of bluebird's common stock as of that date.

24. For the fiscal year ending December 31, 2022 (the "2022 Fiscal Year"),[2] Defendant Obenshain received $1,814,700 in total compensation from the Company. This included $643,390 in salary, $421,830 in option awards, $351,000 in stock awards, $386,280 in non-equity incentive plan compensation, and $12,200 in all other compensation. For the 2023 Fiscal Year, Defendant Obenshain received a base salary of $682,400.

25. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Obenshain made the following sales of Company common stock:

| **Date** | **Number of Shares** | **Avg. Price/Share** | **Proceeds** |
|---|---|---|---|
| August 10, 2023 | 16,929 | $3.54 | $59,962 |
| November 3, 2023 | 807 | $3.17 | $2,554 |

Thus, in total, before the fraud was exposed, he sold 17,736 shares of Company common stock on inside information, for which he received $62,516 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

26. The 2023 Proxy Statement stated the following about Defendant Obenshain:

> Since November 2021, Mr. Obenshain has served as bluebird's President and Chief Executive Officer. Mr. Obenshain previously served as bluebird's President, Severe Genetic Diseases from August 2020 to November 2021, and as bluebird's Senior Vice President, Head of Europe from 2016 to August 2020. Prior to that, from September 2015 to September 2016, Mr. Obenshain was the general manager of France and Benelux at Shire Pharmaceuticals, Inc. and from 2007 to 2013, he held

[2] This financial data is based on the most recent publicly available data. The last proxy statement filed by the Company was filed over a year ago, on April 28, 2023. The most recent annual report on Form 10-K was filed on March 29, 2023.

> roles of increasing responsibility at Genzyme. Mr. Obenshain received his M.B.A. from Northwestern University's Kellogg School of Management, and his B.A. in genetics, cell and developmental biology from Dartmouth College.

**Defendant Krawtschuk**

27. Defendant Krawtschuk served as CFO from November 2022 until June 10, 2024.

28. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Krawtschuk made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| December 6, 2023 | 4,526 | $4.52 | $20,439 |

Thus, in total, before the fraud was exposed, he sold 4,526 shares of Company common stock on inside information, for which he received $20,439 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

29. The 2023 Proxy Statement stated the following about Defendant Krawtschuk:

> *Christopher Krawtschuk* – Mr. Krawtschuk has served as our Chief Financial Officer since November 2022. Previously, Mr. Krawtschuk served as Chief Financial Officer of Jubilant Pharma from February 2021 to October 2022, where he established the US-based finance and business operations team. Prior to Jubilant Pharma, from December 2018 to January 2021, Mr. Krawtschuk served as U.S. Chief Financial Officer and Treasurer of Morphosys. In 2018, Mr. Krawtschuk served as North American Controller at Unilever. Mr. Krawtschuk served as vice president, lead divisional controller for Pfizer from 2016 to 2018 where he was responsible for accounting advisory and financial reporting support to all global businesses and support functions. Mr. Krawtschuk began his financial career at PricewaterhouseCoopers where he held several positions of increasing responsibility from 2001 to 2016. Mr. Krawtschuk received his B.S. in Accounting from William Paterson University and is licensed as a CPA.

**Defendant Colvin**

30. Defendant Colvin has served as the CMO of the Company since October 2022. Previously, Defendant Colvin served as interim CMO from March 2021 through September 2022,

as Vice President and head of severe genetic diseases clinical research and development from January 2020 to March 2021, and as Vice President, Medical Lead Thalassemia Program from 2018 until January 2020. According to the 2023 Proxy Statement, Defendant Colvin beneficially owned 160,129 shares of the Company's common stock as of April 24, 2023. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023, was $3.44, Defendant Colvin owned approximately $550,843.76 worth of bluebird's common stock as of that date.

31. For the 2022 Fiscal Year, Defendant Colvin received $1,364,776 in total compensation from the Company. This included $467,639 in salary, $374,297 in option awards, $294,240 in stock awards, $216,000 in non-equity incentive plan compensation, and $12,600 in all other compensation. For the 2023 Fiscal Year, Defendant Colvin received a base salary of $490,000.

32. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Colvin made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| November 2, 2023 | 2,343 | $2.98 | $6,975 |

Thus, in total, before the fraud was exposed, he sold 2,343shares of Company common stock on inside information, for which he received $6,975 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

33. The 2023 Proxy Statement stated the following about Defendant Colvin:

> *Richard A. Colvin, M.D., Ph.D.* – Dr. Colvin has served as our Chief Medical Officer since October 2022. Previously, Dr. Colvin was our interim Chief Medical Officer from March 2021 through September 2022 and our Vice President and head

> of severe genetic diseases clinical research and development from January 2020 to March 2021. Dr. Colvin joined us in 2018 as Vice President, Medical Lead Thalassemia Program, for the successful European submission and approval of the Company's beti-cel gene therapy for the treatment of patients with beta-thalassemia. Dr. Colvin is on faculty at Harvard Medical School and also sees patients as a Clinical Associate in Medicine, Infectious Diseases Clinic, at Massachusetts General Hospital Chelsea Health Care Center. Prior to joining bluebird, Dr. Colvin was an executive director in translational medicine at Novartis, where he led anti-infective drug development programs for the treatment of patients with certain infections from 2014 to 2018. Previously, Dr. Colvin completed his clinical and research fellowships in the Mass General Brigham Infectious Diseases Program and completed his internship and residency at the Brigham and Women's Hospital. Dr. Colvin received his M.D. and Ph.D. from Duke University School of Medicine and his B.S. in Biology from Cornell University.

**Defendant Agwunobi**

34. Defendant Agwunobi has served as a Company director since June 8, 2017. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. According to the 2023 Proxy Statement, Defendant Agwunobi beneficially owned 47,075 shares of the Company's common stock as of April 24, 2023. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023 was $3.44, Defendant Agwunobi owned approximately $161,938 worth of bluebird's common stock as of that date.

35. For the 2022 Fiscal Year, Defendant Agwunobi received $91,306 in total compensation from the Company. This included $64,000 in fees earned or paid in cash, $13,440 in option awards, and $13,866 in stock awards.

36. The 2023 Proxy Statement stated the following about Defendant Agwunobi:

> Dr. Agwunobi was Chief Executive Officer and Chairman of the Board of Herbalife Nutrition Inc. from 2020 to 2022. Previously, Dr. Agwunobi served as Co-President of Herbalife from May 2018 to 2020. He also served as Chief Health and Nutrition Officer at Herbalife, responsible for training, education, science strategy and product development from 2016 to 2018. Prior to joining Herbalife, Dr. Agwunobi was an independent consultant, advising a number of privately-held health-related companies, including serving as an advisory board member of Shopko Stores

> Operating Co., LLC on behalf of the private equity firm Sun Capital Partners. From September 2007 to April 2014, Dr. Agwunobi served as Senior Vice President and President of Health and Wellness for Wal-Mart (NYSE: WMT) in the United States where he grew the business and provided insight and advice on the company's health reform position. From December 2005 to September 2007, he served as the Assistant Secretary of Health for the U.S. Department of Health and Human Services, where he was responsible for disease prevention and health promotion. His responsibilities included the oversight of the Centers for Disease Control, National Institute of Health, the U.S. Food and Drug Administration, the Office of the U.S. Surgeon General, and numerous other public health offices and programs.

**Defendant Jones**

37. Defendant Jones has served as a Company director since March 4, 2022. She also serves as a member of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, Defendant Jones beneficially owned 7,163 shares of the Company's common stock as of April 24, 2023. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023 was $3.44, Defendant Jones owned approximately $24,640.72 worth of bluebird's common stock as of that date.

38. For the 2022 Fiscal Year, Defendant Jones received $108,871 in total compensation from the Company. This included $40,871 in fees earned or paid in cash, $33,384 in option awards, and $34,616 in stock awards.

39. The 2023 Proxy Statement stated the following about Defendant Jones:

> Since January 2022, Dr. Jones-Burton has served as Senior Vice President, Product Development and Strategy at Chinook Therapeutics, a clinical-stage biotechnology company discovering, developing and commercializing precision medicines for rare, severe kidney diseases. Immediately prior to her current role at Chinook Therapeutics she was VP, Global Clinical Development Head, Nephrology at Otsuka Pharmaceutical Development & Commercialization, Inc. from September 2019 to December 2021. From October 2016 until September 2019, Dr. Jones-Burton held various positions at Bristol-Myers Squibb Company with increasing responsibilities, most recently as Executive Director, Full Development Team Leader of Cardiovascular, Anti-Thrombosis. Prior to that, Dr. Jones-Burton was with Merck & Co. from 2007 to May 2011. With more than 20 years of experience as a clinical development leader, internal medicine and nephrology physician and academician, Dr. Jones-Burton is dedicated to creating healthier communities

> through drug development, patient advocacy and people engagement. Dr. Jones-Burton is also active in numerous professional associations and organizations and founded Women of Color in Pharma (WOCIP), a non-profit professional society focused women of color in the pharmaceutical industry. Dr. Jones-Burton earned a medical degree and Master of Science degree in Epidemiology and Preventive Medicine, with a concentration in Clinical Research, from the University of Maryland School of Medicine. Dr. Jones-Burton's postgraduate training included an internal medicine residency and a nephrology fellowship at the University of Maryland Medical Systems.

**<u>Defendant Leiderman</u>**

40. Defendant Leiderman has served as a Company director since October 15, 2021. She also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. According to the 2023 Proxy Statement, Defendant Leiderman beneficially owned 10,243 shares of the Company's common stock as of April 24, 2023. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023 was $3.44, Defendant Leiderman owned approximately $35,235.92 worth of bluebird's common stock as of that date.

41. For the 2022 Fiscal Year, Defendant Leiderman received $97,806 in total compensation from the Company. This included $70,500 in fees earned or paid in cash, $13,440 in option awards, and $13,866 in stock awards.

42. The 2023 Proxy Statement stated the following about Defendant Leiderman:

> Since November 2022, Dr. Leiderman has served as Chief Financial Officer and Chief Business Officer at Atsena Therapeutics, a clinical-stage gene therapy company. Before joining Atsena, from September 2020 to October 2022, Dr. Leiderman was Chief Financial Officer and Head of Corporate Development at Decibel Therapeutics, a clinical stage biotechnology company developing novel gene therapeutics for restoration of hearing loss and balance disorders. From January 2020 to August 2020, Dr. Leiderman served as Chief Business Officer for Complexa, Inc., a clinical stage biopharmaceutical company focused on life-threatening fibrosis and inflammatory diseases. Prior to Complexa, Dr. Leiderman was Senior Vice President, Head of Corporate Development at Fortress Biotech from November 2016 to November 2019. Earlier in her career from 2007 to 2016, Dr. Leiderman developed her transaction and capital markets expertise in the healthcare investment banking groups at Nomura, Credit Suisse, Jefferies and UBS. Dr. Leiderman began her career in medical affairs at AstraZeneca, where she

> analyzed product and industry trends related to the central nervous system. Dr. Leiderman earned an M.D. from the Sackler School of Medicine at Tel Aviv University, an M.B.A. from The Wharton School at the University of Pennsylvania and a B.A. from The University of Pennsylvania.

**Defendant Leschly**

43. Defendant Leschly has served as a Company director since October 2010. Previously, he served as the Company's President and CEO from October 2010 until November 2021. According to the 2023 Proxy Statement, Defendant Leschly beneficially owned 1,233,910 shares of the Company's common stock as of April 24, 2023. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023 was $3.44, Defendant Leschly owned approximately $4.2 million worth of bluebird's common stock as of that date.

44. For the 2022 Fiscal Year, Defendant Leschly received $27,306 in total compensation from the Company. This included $13,440 in option awards and $13,886 in stock awards.

45. The 2023 Proxy Statement stated the following about Defendant Leschly:

> Since November 2021, Mr. Leschly has served as Chief Kairos Officer of 2seventy bio, Inc., a cell and gene therapy company. Mr. Leschly previously served as bluebird's President and Chief Executive Officer from October 2010 to November 2021. Formerly a partner of Third Rock Ventures, L.P. since its founding in 2007 until 2010, Mr. Leschly played an integral role in the overall formation, development and business strategy of several of Third Rock's portfolio companies, including Agios Pharmaceuticals, Inc. and Edimer Pharmaceuticals, Inc. Prior to joining Third Rock, he worked at Millennium Pharmaceuticals, Inc. (now a subsidiary of Takeda), leading several early-stage drug development programs and served as the product and alliance leader for VELCADE. Mr. Leschly also founded and served as Chief Executive Officer of MedXtend Corporation. He received his B.S. in molecular biology from Princeton University and his M.B.A. from The Wharton School of the University of Pennsylvania.

**Defendant Paulson**

46. Defendant Paulson has served as a Company director since April 3, 2023.

47. The 2023 Proxy Statement stated the following about Defendant Paulson:

> Since 2021, Mr. Paulson has been President, Chief Executive Officer and Director at Karyopharm Therapeutics, a commercial-stage pharmaceutical company. Previously, Mr. Paulson was Executive Vice President of Ipsen Pharmaceuticals and Chief Executive Officer of Ipsen North America from 2018 to 2021 where he focused on innovative therapies and specialty care for oncology, neuroscience and rare diseases. Before joining Ipsen, Mr. Paulson work at Amgen for 10 years holding various leadership positions across Europe and North America. Mr. Paulson received his M.B.A. from the University of Saskatchewan and his B.Com in marketing and finance from the University of Toronto.

**Defendant Tita**

48. Defendant Tita has served as a Company director since September 29, 2021. She also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, Defendant Tita beneficially owned 11,247 shares of the Company's common stock as of April 24, 2023. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023 was $3.44, Defendant Tita owned approximately $38,689.68 worth of bluebird's common stock as of that date.

49. For the 2022 Fiscal Year, Defendant Tita received $84,806 in total compensation from the Company. This included $57,500 in fees earned or paid in cash, $13,440 in option awards, and $13,866 in stock awards.

50. The 2023 Proxy Statement stated the following about Defendant Tita:

> Since April 2021, Ms. Tita-Reid has served as Global Chief Marketing Officer at Logitech, consumer electronics company, where she leads the transformation of the global marketing function and spearheads a strategic, digital-first, and data-driven consumer and customer omnichannel experience. Prior to this role, Ms. Tita-Reid served as Global Commercial Marketing Head from June 2020 to March 2021 and on the Global Marketing Reinvention team from February 2020 to May 2020 at Logitech. Previously, Ms. Tita-Reid served as Global Chief Marketing Officer and Executive Board Member for Hero-AG, a family-run healthy food company, from August 2017 to January 2020. In this role, she developed the organization's marketing function and brand strategy and built the first global innovation pipeline while overseeing the R&D, innovation, sustainability and quality functions. Prior to Hero-AG, Ms. Tita-Reid held leadership positions at Bayer PLC, where she

> served as Vice President-Country Division Head for Consumer Care in the UK and Ireland from 2014 to 2017 and Merck & Co, Inc., where she served in various roles from 2011 to 2014, including General Manager for Western Europe from 2013 to 2014. Earlier in her career, Ms. Tita-Reid spent 19 years at Procter & Gamble, where she managed a number of consumer brands in the baby and feminine care categories, spearheaded multi-cultural marketing strategy across 15 billion-dollar brands, and led the multi-brand business unit for Hispanic and African American consumers. During her tenure, Ms. Tita-Reid trained and developed the P&G marketing function on ethnic marketing, and created breakthrough marketing strategies. Ms. Tita-Reid graduated with a Bachelor of Arts from Spelman College and holds an M.B.A. from Fuqua School of Business at Duke University.

**Defendant Vachon**

51. Defendant Vachon as Chairman of the Board since November 2021 and as a Company director since July 2014. He also serves as a member of the Audit Committee and as the Chair of the Compensation Committee. According to the 2023 Proxy Statement, Defendant Vachon beneficially owned 46,440 shares of the Company's common stock as of April 24, 2023. Given that the price per share of the Company's common stock at the close of trading on April 24, 2023 was $3.44, Defendant Vachon owned approximately $159,753.60 worth of bluebird's common stock as of that date.

52. For the 2022 Fiscal Year, Defendant Vachon received $142,230 in total compensation from the Company. This included $104,000 in fees earned or paid in cash, $18,816 in option awards, and $19,414 in stock awards.

53. The 2023 Proxy Statement stated the following about Defendant Vachon:

> Mr. Vachon served as President and Executive Vice President at Change Healthcare Holdings, Inc. from November 2016 to April 2018. For over 30 years, Mr. Vachon held a variety of leadership positions across the General Electric organization, and was a company officer beginning in 1999 and a member of GE's Corporate Executive Council. Mr. Vachon was President and CEO of GE Healthcare Americas from 2009 to 2010, and prior to that he was President and CEO of Global Diagnostics Imaging, GE Healthcare, between 2006 and 2009. Between 2003 and 2006, Mr. Vachon was Executive Vice President and CFO of GE Healthcare. Mr. Vachon holds a B.S. in Finance from Northeastern University and an M.A. from Boston College.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

54. By reason of their positions as officers and/or directors of bluebird and because of their ability to control the business and corporate affairs of bluebird, the Individual Defendants owed bluebird and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage bluebird in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of bluebird and its shareholders so as to benefit all shareholders equally.

55. Each director and officer of the Company owes to bluebird and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

56. The Individual Defendants, because of their positions of control and authority as directors and/or officers of bluebird, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

57. To discharge their duties, the officers and directors of bluebird were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

58. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of bluebird, the absence of good faith on

their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised bluebird's Board at all relevant times.

59. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

60. To discharge their duties, the officers and directors of bluebird were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of bluebird were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to bluebird's own Code of Business Conduct and Ethics ("Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how bluebird conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of bluebird and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that bluebird's operations would comply with all applicable laws and bluebird's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

61. Each of the Individual Defendants further owed to bluebird and the shareholders the duty of loyalty requiring that each favor bluebird's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

62. At all times relevant hereto, the Individual Defendants were the agents of each other and of bluebird and were at all times acting within the course and scope of such agency.

63. Because of their advisory, executive, managerial, and directorial positions with bluebird, each of the Individual Defendants had access to adverse, non-public information about the Company.

64. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by bluebird.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

65. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

66. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

67. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of bluebird was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

68. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

69. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of bluebird and was at all times acting within the course and scope of such agency.

**BLUEBIRD'S CODE OF BUSINESS CONDUCT AND ETHICS**

70. The Company's Code of Conduct applies to "[a]ll employees of bluebird and its subsidiaries, including corporate officers and members of our Board of Directors, are required to read, understand, and follow our Code."

71. The Code of Conduct provides, under the heading "Accountability and discipline," in relevant part:

> Violating our Code, our policies, or the law, or encouraging others to do so, exposes bluebird to liability and puts our reputation at risk. If an ethics or compliance problem does occur, we are all accountable to report it so that an effective solution can be developed. You should also understand that violations of laws or regulations may result in legal proceedings and penalties including, in some circumstances, criminal prosecution.

72. Under the heading "Protecting our information," the Code of Conduct states the following, in relevant part:

> **Confidential information**
>
> This information is sensitive and critical to our business, and it is not available to the public. Examples of our confidential information include:
>
> » Business and marketing plans.
>
> » Company initiatives (existing, planned, proposed, or developing).
>
> » Customer lists.
>
> **Intellectual property**
>
> Intellectual property (IP) is a type of confidential information that is a critical asset that we create in our work at bluebird. It belongs to bluebird and may not be used for personal gain. Examples of our IP include:
>
> » Trade secrets and discoveries.
>
> » Methods, know-how, and techniques.
>
> » Innovations and designs.
>
> » Systems, software, and technology.
>
> » Patents, trademarks, and copyrights.

73. Under the heading "Avoiding conflicts of interest," the Code of Conduct states the following, in relevant part:

> A conflict of interest can occur whenever you have a competing interest that may interfere with your ability to make an objective decision on behalf of bluebird. Each of us is expected to use good judgment and avoid situations that can lead to even the appearance of a conflict, which can undermine the trust others place in us and

> damage our reputation. Conflicts of interest may be actual, potential, or even just a matter of perception. Since these situations are not always clear-cut, you need to fully disclose them to your manager so that we can properly evaluate, monitor, and manage them.

74. Under the heading "Promoting product safety and quality," the Code of Conduct states the following, in relevant part:

> We develop our products with patient communities in mind and are dedicated to ensuring they receive safe, high-quality therapies. Our commitment to safety, integrity, strength, purity, and quality has allowed us to earn the trust of patients and physicians around the world.
>
> ***
>
> We deliver on our promises and ensure that we meet the highest standards by:
>
> » Innovating our processes and operations everywhere we do business.
>
> » Following the most stringent regulations applicable.
>
> » Testing our products to ensure that only those of the highest quality reach the market.
>
> » Evaluating the performance of our products throughout their lifecycle to ensure quality and reliability.
>
> » Ensuring the traceability/chain-of-identity of all products so patients receive only the cells they donated.

75. Under the heading "Complying with healthcare laws/regulations," the Code of Conduct states the following, in relevant part:

> We comply with all applicable laws that regulate our business. Many of these laws concern the way we promote and sell our products. It is never acceptable to try to influence purchasing decisions in any way that is unethical, inappropriate, or illegal, or creates a potential conflict of interest. We are honest, open, and up-front when we interact with those who may be interested in buying or prescribing our products.
>
> ***
>
> **The laws that apply to our business**

> We abide by all laws, regulations, policies, and procedures that apply to our jobs, including:
>
> » U.S. Foreign Corrupt Practices Act, the UK Bribery Act and similar laws in other countries. We do not participate in bribery or corruption and adhere to all local laws and regulations that cover bribery and corruption.
>
> » U.S. Anti-Kickback Statute and similar Anti-Gift laws in other countries. We don't give anything of value to induce a healthcare professional to use or recommend pharmaceutical products that are paid for or reimbursed by the government.
>
> » U.S. False Claims Act, E.U. Regulation No 883/2013 (European AntiFraud Office (OLAF)) and similar laws in other countries. We don't submit or cause the submission of false claims for healthcare reimbursement.
>
> » U.S. Food, Drug, and Cosmetic Act, E.U. Code for Human Medicines Directive, and similar laws in other countries. We don't promote a regulated product or an indication that has not received the appropriate regulatory approval.
>
> » Transparency Laws and Trade Association Guidelines. We report certain payments to healthcare professionals and other customers, as required by transparency laws and regulations in every location where we operate.

76. Under the heading "Promoting financial integrity," the Code of Conduct states the following, in relevant part:

> The accuracy and completeness of our disclosures and business records is essential to making informed decisions and serve as a basis for meeting our obligations to investors, regulators, employees, stockholders, and others. Our books and records must accurately and fairly reflect our transactions in sufficient detail and must be in accordance with our accounting practices and policies.
>
> ***
>
> **Retaining corporate records**
>
> Documents should only be disposed of in compliance with our policies and should never be destroyed or hidden. You must never conceal wrongdoing or permit others to do so. Never destroy documents in response to – or in anticipation of – an investigation or audit.

77. Under the heading "Avoiding insider trading," the Code of Conduct states the following in relevant part:

In the course of business, you may learn confidential information about bluebird or about other publicly traded companies that is not available to the public at large. Trading securities while aware of such material nonpublic information or disclosing such information to others who then trade ("tipping"), is prohibited by various laws.

**Material information**

This kind of nonpublic information is something a reasonable investor would take into consideration when deciding whether to buy or sell a company's securities. Some examples of information that may be material are:

» Results or status of a research and development or clinical program (e.g., clinical trial results).

» A proposed strategic alliance, license or collaboration with another company.

» A possible merger, acquisition, or sale of a business.

» ***Financial events such as equity or debt financing, financial forecasts, or financial results for the quarter or year.***

» A significant expansion or cutback of operations.

» ***Information regarding the manufacturing, marketing, and sales of a product***.

» Major personnel changes.

» Major litigation matters and developments.

78. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct and law. Additionally, three of the Individual Defendants further violated the Code of Conduct by engaging

in insider trading by selling personal shareholdings on material nonpublic information while the Company's stock traded at artificially inflated prices.

**BLUEBIRD'S AUDIT COMMITTEE CHARTER**

79. The Company's Audit Committee Charter (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

80. Per the Audit Committee Charter, under the heading "General Statement of Purpose," the Audit Committee Charter outlines the Audit Committee's responsibilities, in relevant part:

> The purposes of the Audit Committee of the Board of Directors of bluebird bio, Inc. are to:
>
> - oversee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements;
> - take, or recommend that the Board of Directors of the Company (the "Board") take, appropriate action to oversee the qualifications, independence and performance of the Company's independent auditor;
> - oversee the qualifications, independence and performance of the Company's internal audit function;
> - prepare the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement;
> - oversee the procedures for addressing complaints and concerns regarding accounting, internal accounting controls or auditing matters; and
> - review related person transactions.

81. Under the heading "Responsibilities and Authority," the Audit Committee Charter outlines, in relevant part:

> **Audited Financial Statements and Annual Audits**
>
> - The Audit Committee shall review the overall audit plan with the independent auditor and the members of management who are responsible for preparing the Company's financial statements, including the Company's Principal Financial

Officer ("PFO") and/or principal accounting officer ("PAO" and together with the PFO and such other officer or officers are referred to herein collectively as the "Senior Accounting Executive").

- The Audit Committee shall review and discuss with management (including the Company's Senior Accounting Executive) and with the independent auditor the Company's annual audited financial statements, including (a) all critical accounting policies and practices used or to be used by the Company, (b) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to the filing of the Company's Annual Report on Form 10-K, and (c) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements.

- The Audit Committee shall review:

(i) any analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements. The Audit Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements, and the treatment preferred by the independent auditor. The Audit Committee may also consider other material written communications between the registered public accounting firm and management, such as any management letter or schedule of unadjusted differences;

(ii) major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

(iii) major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles;

(iv) the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the financial statements of the Company; and

(v) the certifications made by the Company's principal executive officer ("PEO") and PFO.

- The Audit Committee shall review and discuss with the independent auditor (outside of the presence of management) how the independent auditor plans to handle its responsibilities under the Private Securities Litigation Reform Act of 1995, and request assurance from the independent auditor that Section 10A(b) of the Exchange Act has not been implicated.

- The Audit Committee shall review and discuss with the independent auditor any audit problems or difficulties and management's response thereto. This review shall include (1) any difficulties encountered by the independent auditor in the course of performing its audit work, including any restrictions on the scope of its activities or its access to information and (2) any significant disagreements with management.

82. Under the heading "Earnings Press Releases," the Audit Committee Charter outlines, in relevant part:

- Prior to public release, the Audit Committee shall discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentations to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information).

83. Under the heading "Legal and Regulatory Compliance," the Audit Committee Charter states, in relevant part:

- The Audit Committee may discuss with management and the independent auditor, and review with the Board, the legal and regulatory requirements applicable to the Company and its subsidiaries and the Company's compliance with such requirements. After these discussions, the Audit Committee may, if it determines it to be appropriate, make recommendations to the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations.

- The Audit Committee may discuss with management legal matters (including pending or threatened litigation) that may have a material effect on the Company's financial statements or its compliance policies and procedures.

84. Under the heading "Conflicts of Interest," the Audit Committee Charter states, in relevant part:

- The Audit Committee shall conduct an appropriate review of all related party transactions for potential conflict of interest situations on an ongoing basis, and the approval of the Audit Committee shall be required for all such transactions, in accordance with the Company's Related Person Transaction Approval Policy.

- The Audit Committee shall designate an individual to serve as the Compliance Officer under the Related Person Transaction Approval Policy and shall have the authority to remove and replace the Compliance Officer at any time.

- The Audit Committee shall review and reassess the adequacy of the Related Person Transaction Approval Policy annually and recommend any proposed changes to the Board for approval.

85. Under the heading "Insider Trading Policy," the Audit Committee Charter states, in relevant part:

- The Audit Committee shall periodically review the Company's Policy and Procedures on Insider Trading and Disclosure and recommend any proposed changes to the Board for approval.

86. The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

87. Founded on April 16, 1992, bluebird is a biotechnology company incorporated in Delaware and based in Somerville, Massachusetts. The Company is known for creating,

commercializing, and studying gene therapies for severe genetic disorders. bluebird's main purpose is to, "develop[] and deliver[] new therapies for severe genetic diseases that currently have limited or no treatment options. Our goal is to provide hope for a better life . . . for patients and their families."

88. Furthermore, the Company has several products for different genetic disorders including, Zynteglo for the treatment of transfusion dependent ß thalassemia; Lyfgenia for the treatment of SCD; and Skysona for the treatment of CALD.

89. On August 17, 2022, the FDA approved Zynteglo for treating children and adults living with ß thalassemia who need regular red blood transfusions.

90. One month later, on September 17, 2022, the FDA granted accelerated approval of Skysona, bluebird's drug that slows down the development of neurological dysfunction in male pediatric patients aged 4-17 years old with CALD. Bluebird purports that the Company became a "leading commercial gene therapy company" after the FDA approved Zynteglo and Skysona.

91. On April 24, 2023, bluebird made public that it had applied to the FDA for a BLA for lovo-cel gene therapy for patients 12 and older with SCD with a history of VOEs. Additionally, the Company requested, as a part of this application, priority review by the FDA. Priority review would shorten the review of the application to 6 months from the time of filing, versus the normal timeline for review, which is 10 months.

92. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to bluebird, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the FDA would not approve lovo-cel gene therapy without a black box warning for

haematological malignancies; (2) the Company would not obtain a priority review voucher from the FDA for lovo-cel and, consequently, could not sell lovo-cel to reinforce bluebird's financial position before lovo-cel débuted; (3) as a result, Lyfgenia's commercial and/or clinical forecasts were materially exaggerated and overstated; (4) the Company failed to maintain internal controls; and (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2023 Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**False and Misleading Statements**

***April 24, 2023 Press Release***

93. On April 24, 2023, the Company published a press release stating that it had submitted a BLA to the FDA for its lovo-cel gene therapy for patients 12 and older with SCD and who have a history of VOEs. The press release detailed, in relevant part:

> The BLA includes a request for Priority Review, which, if granted, would shorten the FDA's review of the application to six months from the time of filing, versus a standard review timeline of 10 months. If approved, lovo-cel will be bluebird bio's third ex-vivo gene therapy approved by the FDA for a rare genetic disease and it second FDA approval for an inherited hemoglobin disorder, building on more than a decade of leadership in gene therapy.
>
> "The severity of sickle cell disease, and its impact on patients and caregivers, has been underappreciated and overlooked for far too long. Transformative therapies for this community are long overdue," said Andrew Obenshain, chief executive officer, bluebird bio. "We are pleased to have satisfied the Agency's questions about comparability to enable our BLA submission, and to take this important step toward making lovo-cel available for individuals living with SCD."
>
> Lovo-cel is the most deeply studied gene therapy in development for sickle cell disease. The BLA submission is based on efficacy results from 36 patients in the HGB-206 Group C cohort with a median 32 months of follow-up and two patients in the HGB-210 study with 18 months of follow-up each. The BLA submission also includes safety data from 50 patients treated across the entire lovo-cel program, including six patients with six or more years of follow-up.

> The FDA previously granted lovo-cel orphan drug designation, fast track designation, regenerative medicine advanced therapy (RMAT) designation, and rare pediatric disease designation for the treatment of SCD.

***April 28, 2023 Proxy Statement***

94. On April 28, 2023, bluebird filed the 2023 Proxy Statement with the SEC. Defendants Obenshain, Agwunobi, Jones, Leiderman, Leschly, Paulson, Tita, and Vachon, solicited the 2023 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

95. The 2023 Proxy Statement called for the Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Jones and Vachon to the Board; (2) approve, on a non-binding, advisory basis, the compensation paid to the Company's named executive officers; (3) approve an amendment to the Company's Amended and Restated Certificate of Incorporation to increase the number of authorized shares of the Company's common stock; (4) approve the 2023 Incentive Plan; and (5) ratify the selection of Ernst & Young LLP ("EY") as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

96. Regarding "Leadership Structure and Risk Oversight," the 2023 Proxy Statement stated the following:

> Our Corporate Governance Guidelines provide that the Board shall fill the Chair of the Board and Chief Executive Officer positions based on the Board's view of what is in the Company's best interest. The Roles of Chair of the Board and Chief Executive Officer are currently separate, with Mr. Vachon serving as Chair and Mr. Obenshain serving as Chief Executive Officer. Our Board believes that separation of the positions of Chair and Chief Executive Officer reinforces the independence of the Board from management, creates an environment that encourages objective oversight of management's performance and enhances the effectiveness of the Board as a whole. The Board retains the flexibility to change its leadership structure from time to time as appropriate based on its view of the best interests of the Company.
>
> We face a number of risks in our business, including risks related to clinical research and development of our programs in severe genetic disease and oncology;

manufacturing and supply chain; regulatory reviews and approvals; commercial operations and our ability to obtain reimbursement for our approved products; growth and capability expansion in the United States; intellectual property filings, prosecution, maintenance and challenges; the establishment and maintenance of strategic alliances; competition; litigation and government investigations; and the ability to access additional funding for our business; among other risks. Our management is responsible for the day-to-day management of the risks that we face, while our Board, as a whole and through its committees, has responsibility for the oversight of risk management.

Our Board performs its oversight role by using several different levels of review. Our Chair meets regularly with our Chief Executive Officer and other executive officers to discuss our strategy and material risks. Members of senior management attend the quarterly Board meetings, present on strategic matters involving our business, and are available to address any questions or concerns raised by the Board on risk management-related issues and any other matters. Our Board reviews the risks, including any environmental, social or governance risks, associated with our business strategies periodically throughout the year as part of its consideration of undertaking any such business strategies. Moreover, our Audit Committee oversees enterprise risk management and discusses guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by management.

Each of the committees of our Board also oversees the management of our risk that falls within the committee's areas of responsibility. In performing this function, each committee has full access to management, as well as the ability to engage advisors. The Audit Committee oversees our enterprise risk management program as it relates to our operations by identifying the primary risks associated with our operations and corporate functions, receiving periodic updates on activities to manage such risks, and providing reports to the Board regarding such activities. In carrying out its responsibilities for the oversight of operational risk management, members of the Audit Committee regularly discuss with management our risk exposures in the areas of financial reporting, internal controls, information security, and our legal and regulatory compliance programs, and the steps we take to manage them. Our Chief Financial Officer, our Chief Legal & Business Officer, and our Chief Compliance Officer all periodically provide reports to the Audit Committee and are responsible for identifying, evaluating and implementing risk management controls and methodologies to address any identified risks. Our Audit Committee also meets privately with representatives from our independent registered public accounting firm as part of its oversight of our risk management. The Compensation Committee assists the Board in fulfilling its oversight responsibilities with respect to the management of risks arising from our compensation policies and programs and succession planning for our executive officers, and evaluates potential risks associated with independent director compensation for consideration by the full Board. The Nominating and Corporate Governance Committee assists the Board in fulfilling its oversight responsibilities with respect to the management of risks

associated with Board organization, membership and structure, succession planning for our directors, and corporate governance.

97. Regarding the Code of Conduct, the 2023 Proxy Statement stated that:

> We have adopted a Code of Business Conduct and Ethics for our directors, officers and employees, including our President and Chief Executive Officer, Principal Financial Officer, Principal Accounting Officer, and Controller (or persons performing an equivalent function). We provide mandatory online training for our employees with respect to the Code of Business Conduct and Ethics on an annual basis to ensure understanding and the importance of adhering to such guidelines. A copy of our Code of Business Conduct and Ethics may be accessed free of charge by visiting the Company's website at *www.bluebirdbio.com* and going to the *Investors & Media—Corporate Governance* section or by requesting a copy in writing from Joseph Vittiglio, Secretary, at our Somerville, Massachusetts office. We intend to post on our website any amendment to, or waiver under, a provision of the Code of Business Conduct and Ethics that applies to our President and Chief Executive Officer, Principal Financial Officer, Principal Accounting Officer, or Controller (or persons performing an equivalent function) within four business days following the date of such amendment or waiver.

98. The 2023 Proxy Statement also solicited shareholder approval of the 2023 Incentive Plan, which called for the issuance of 5,200,000 shares to be issued under the 2023 Incentive Plan. The misrepresentations and omissions set forth herein were material to shareholders in voting on approval of the 2023 Incentive Plan who would not have approved the 2023 Incentive Plan had they been informed of the true financial state of the Company and the wrongdoing alleged herein. According to the 2023 Proxy Statement, the 2023 Incentive Plan "is essential" to the Company's "success" and is "intended to incentivize, retain, and motivate participants and align the interests of our directors, employees and consultants with those of our shareholders."

99. The 2023 Incentive Plan authorized the issuance of "stock options, SARs, restricted stock, RSUs, performance bonus awards, performance stock units, other stock or cash-based awards, dividend equivalents, or any combination thereof." Under the "Key Features" of the 2023 Incentive Plan, the 2023 Proxy Statement stated the confines of the 2023 Incentive Plan: "The sum of the grant date fair value of all equity-based awards and the maximum amount that may become

payable pursuant to all cash-based awards that may be as compensation for services as a non-employee director during any calendar year may not exceed $750,000; provided that such maximum amount will not exceed $1,000,000 in the calendar year of any such non-employee director's initial election or appointment to the Board."

100. Note that under the 2023 Incentive Plan, no non-employee director may be granted awards having an aggregate grant date fair value that exceeds $750,000. Defendants Obenshain, Agwunobi, Jones, Leiderman, Leschly, Paulson, Tita, and Vachon are all eligible to receive stock awards under the 2023 Incentive Plan, have all already received various amounts of stock awards under the 2023 Incentive Plan, and will receive material amounts of stock awards under the 2023 Incentive Plan in the future, thereby materially benefitting from the adoption of the 2023 Incentive Plan.

101. The Individual Defendants received lucrative compensation, while numerous of them made false and misleading statements, during and after the solicitation of the 2023 Proxy Statement. Shareholders would not have approved the proposals in the 2023 Proxy Statement, and thus, the 2023 Incentive Plan, had they known the truth about bluebird. In total to date, the Company has awarded the following awards of common stock and stock options to the Individual Defendants pursuant to the 2023 Incentive Plan as a result of shareholders approving the 2023 Incentive Plan under false pretenses:

**AMOUNTS RECEIVED UNDER THE 2023 INCENTIVE PLAN[3]**

| Individual | Date | Stock Options/ Shares of Common Stock Awarded[4] | Conversion Price per share of Derivative Security (as noted in |
|---|---|---|---|

[3] Includes amounts received under the 2023 Incentive Plan by the Individual Defendants between June 16, 2023, the date that the shareholder-approved 2023 Incentive Plan went into effect, to June 27, 2024, the date that this action was filed.

[4] In total, between June 16, 2023 and June 27, 2024, 1,376,600 stock options were granted to the Individual Defendants; 1,650,375 stock options were granted to all directors and named executive

| | | | **Form 4)** |
|---|---|---|---|
| ***Andrew Obenshain***, defendant, CEO, President | **03/01/2024** | 650,000 (options) | $1.56 |
| | **TOTAL awarded:** | **650,000 (options)** | |
| | | | |
| ***Richard A Colvin***, defendant, CMO | **03/01/2024** | 199,000 (options) | $1.56 |
| | **TOTAL awarded:** | **199,000 (options)** | |
| | | | |
| ***Christopher Krawtschuk***, defendant, CFO | **03/01/2024** | 199,000(options) | $1.56 |
| | **TOTAL awarded:** | **199,000 (options)** | |
| | | | |
| ***Charlotte Jones-Burton***, defendant, Director | **06/16/2023** | 21,600 (options) | $3.81 |
| | **06/16/2023** | 10,790 (shares) | N/A |
| | **TOTAL awarded:** | **21,600 (options); 10,790 (shares)** | |
| | | | |
| ***Elisabeth Leiderman***, defendant, Director | **06/16/2023** | 21,600 (options) | $3.81 |
| | **06/16/2023** | 10,790 (shares) | N/A |
| | **TOTAL awarded:** | **21,600 (options); 10,790 (shares)** | |
| | | | |
| ***Nick Leschly***, defendant, Director | **06/16/2023** | 21,600 (options) | $3.81 |
| | **06/16/2023** | 10,790 (shares) | N/A |
| | **TOTAL awarded:** | **21,600 (options); 10,790 (shares)** | |
| | | | |

officers; and 64,740 shares of common stock were awarded to the Individual Defendants.

| | | | |
|---|---|---|---|
| ***Mark Vachon***, defendant, Director | **06/16/2023** | 21,600 (options) | $3.81 |
| | **06/16/2023** | 10,790 (shares) | N/A |
| | **TOTAL awarded:** | **21,600 (options); 10,790 (shares)** | |
| | | | |
| ***John O Agwunobi***, defendant, Director | **06/16/2023** | 21,600 (options) | $3.81 |
| | **06/16/2023** | 10,790 (shares) | N/A |
| | **TOTAL awarded:** | **21,600 (options); 10,790 (shares)** | |
| | | | |
| ***Najoh Tita-Reid***, defendant, Director | **06/16/2023** | 21,600 (options) | $3.81 |
| | **06/16/2023** | 10,790 (shares) | N/A |
| | **TOTAL awarded:** | **21,600 (options); 10,790 (shares)** | |

102. Defendants Obenshain, Agwunobi, Jones, Leiderman, Leschly, Paulson, Tita, and Vachon caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the FDA would not approve lovo-cel gene therapy without a black box warning for haematological malignancies; (2) the Company would not obtain a priority review voucher from the FDA for lovo-cel and, consequently, could not sell lovo-cel to reinforce bluebird's financial position before lovo-cel débuted; (3) as a result, Lyfgenia's commercial and/or clinical forecasts were materially exaggerated and overstated; (4) the Company failed to maintain internal controls; and (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2023 Incentive Plan.

103. The 2023 Proxy Statement also was false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the

Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

104. As a result of Defendants Obenshain, Agwunobi, Jones, Leiderman, Leschly, Paulson, Tita and Vachon causing the 2023 Proxy Statement to be false and misleading, shareholders voted to: (1) reelect Defendants Jones and Vachon to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) appoint EY as the Company's independent registered public accounting firm for the 2023 Fiscal Year; (3) approve, on a non-binding, advisory basis, the compensation paid to the Company's named executive officers; (4) approve an amendment to the Company's Amended and Restated Certificate of Incorporation to increase the number of authorized shares of the Company's common stock; and (5) approve the 2023 Incentive Plan.

***May 11, 2023 Bank of America Annual Healthcare Conference***

105. On May 11, 2023, bluebird attended the Bank of America Annual Healthcare Conference. At the conference, Jason Matthew, the Managing Director of Bank of America's Securities Research Division, asked Defendant Obenshain the following question about the BLA submission for lovo-cel and about the expectation of getting a priority review from the FDA: "Okay, so the big update was obviously lovo-cel and getting the submission in. And maybe it seems like a no-brainer, you'll get priority review, but just your level of confidence that you'll be able to get prior to your review with that." Defendant Obenshain responding by stating, "Well, certainly, that's always up to the FDA, but we do have all the designations. We have the indication for it. So we do believe that we will get that priority review."

106. Jason Matthew then asked a follow-up question: "Got it, okay. The regulatory process, I presume there's going to be an AdCom. Any specific elements of the label that you feel like are important one way or another in terms of being market limiting or giving you more latitude to operate in the space." Defendant Obenshain replied:

> So we do anticipate that there will be an AdCom for us with the FDA, but we are prepared for that. In fact, we've done 2 of them successfully in the past. So I think we think we're pretty good at them. So we'd actually welcome that opportunity. In terms of the label, I don't think there's any one particular area that the FDA would focus on overall. I think the -- if we look back at our ZYNTEGLO AdCom, it was the efficacy and safety, which is pretty standard. So I don't think there's any one element that they're going to actually hold in on versus others.

***August 8, 2023 Earnings Call***

107. On August 8, 2023, the Company held an earnings conference call for the second quarter of the 2023 Fiscal Year. During the call, Defendants Colvin and Krawtschuk were asked about the potential of lovo-cel label and if the FDA would award a priority review voucher. Specifically, Defendants Colvin and Krawtschuk were asked the following question by RBC Capital Markets, Research Division analyst Luca Issi:

> Just 2 quick one here. Maybe on sickle cell disease. What are your expectations for the label?
>
> In particular, do you anticipate that the label will include patients between 12 and 18 years of age? The reason why I'm asking, I believe your competitor does not have patients in that subgroup for the primary efficacy set, at least from the data at EHA. So wondering if it's plausible that you'll get a broader label than your competitor? And if so, what are the implications for the launch?
>
> And then maybe for the runway, can you just remind me if you do get approved for sickle cell disease, will you receive the PRV? And if so, are you planning to monetize it?

Defendant Colvin replied:

> Yes, we submitted the BLA for the treatment of patients who are between 12 and 18 and over in that matter. We included patients between 12 and 18, both in our

> study, HGB-206 Group C as well as in study 210. So for that reason, we have patients who are in that age range and have seen the results from those patients. And I'll turn it back over to Chris.

Defendant Krawtschuk further replied:

> As it relates to the PRV and given Rich's comments, it's possible we could receive a PRV since lovo-cel BLA was accepted for priority review for patients 12 and over. However, as it relates to whether or not we'd monetize it, we of course, would look at the market, evaluate the opportunities in the market and then make a decision based upon what we see there. I don't want to comment today on whether or not -- we monetize it or not until we know whether or not we get a fair price for it. And just as a reminder, the PRV is not factored. Any potential PRV is not factored into our cash runway.

***November 7, 2023 Earnings Call***

108. On November 7, 2023, the Company held an earnings conference call for the third quarter of the 2023 Fiscal Year. During the call, Defendant Obenshain stated information about the launch of lovo-cel and about the FDA not providing an Advisory Committee meeting, in relevant part:

> …I'm excited today to update you on bluebird's Q3 results and our preparations for the potential upcoming FDA approval of lovo-cel. This has been a transformative year for the field of gene therapy and for bluebird bio. We validated the commercial model for gene therapy with our ZYNTEGLO and SKYSONA launches. And as a reminder, bluebird occupies a unique strategic position as one of the only standalone commercial gene and cell therapy companies with an extensive platform of gene therapy expertise that will potentially enable growth, profitability, and expansion for years to come. And we are in an incredibly exciting moment for our company, but most importantly for patients as we approach the potential FDA approval of lovo-cel for sickle cell disease in December.
>
> ***
>
> We believe the fact that the FDA Advisory Committee wasn't requested for lovocel is a testament to the breadth and the depth of the lovo-cel data significantly more than any other gene therapy program for sickle cell disease. Additionally, this is the third lentiviral vector gene therapy that the FDA has reviewed from bluebird and thus, a technology they are very familiar with. Our lentiviral vector technology is also uniquely traceable, giving us an unrivaled understanding of our therapies and the ability to conduct a rigorous monitoring. We understand it can measure how we modify the cell to monitor effects over time. Last week, we announced that in early

> December, we will be presenting long-term follow-up data from our ZYNTEGLO and lovo-cel programs at the 65th ASH Annual Meeting with an unparalleled up to 9 years of follow-up in transfusion-dependent beta-thalassemia and 5 years of follow-up in our sickle cell disease program.
>
> We continue to progress plans for our anticipated lovo-cel commercial launch in early 2024, following its potential FDA approval.

109. Additionally, on the same conference call, Defendant Krawtschuk echoed that the Company entered into an advanced agreement to sell the priority review voucher, which the Company expected to receive from the FDA. He stated, in relevant part:

> . . . We remain on track with our full-year 2023 cash burn guidance in the range of $270 million to $300 million and continue to prudently deploy capital to bring our therapies to our patients. Additionally, last week, we announced that we've entered into an advanced agreement to sell priority review voucher, if granted, for lovocel for sickle cell disease for $103 million. This would be an important source of non-dilutive capital and has the potential to strengthen our financial position ahead of the anticipated launch of lovo-cel.
>
> As of September 30, we had $227 million in cash, cash equivalents, restricted cash, and marketable securities, not including the potential proceeds from the PRV sale or the release of our $53 million in restricted cash, we have a cash runway into Q2 of next year. We plan to provide an updated cash runway guidance by early 2024 and continue to explore additional financing opportunities to further extend our cash runway.

110. Furthermore, on the November 7, 2023 earnings conference call, Defendant Obenshain was asked questions about any relevant updates to the labeling stage of lovo-cel and if there would be any indication of safety events. Specifically, Yanan Zhu, analyst from the Research Division of Wells Fargo Securities, LLC asked, "…First, could you talk about whether for the BLA or lovo-cel, whether you're in the labeling discussion stage with the FDA?" Defendant Obenshain replied, in relevant part:

> Yes. So on the BLA, we don't comment on ongoing interactions with the agency. So we've submitted for the lovo-cel the treatment of patients with sickle cell disease is 12 and older who have a history of vaso-occlusive events, and we are confident in the robustness and maturity of our BLA package and the review process.

111. RBC Capital Markets, Research Division analyst Luca Issi then asked the following question about safety of lovo-cel:

> …And then maybe on safety. Any update on the 2 patients that develop AML in the trial for sickle cell disease? Wondering if you could comment on how they're doing today and maybe bigger picture, whether there is a scenario where you get a label that includes risk of secondary malignancies while your competitor does not? And if that's a scenario, how should we think about implications for the launch?

Defendant Klima responded:

> Sure. Yes, we're going to run the same process on our price for lovo-cel that we ran with ZYNTEGLO and SKYSONA. Obviously, different dynamics in sickle cell disease. But we'll take it into consideration the clinical benefit, quality of life improvements, cost-savings system, impact to society, just like we do with our other therapies, obviously a one-time potentially curative therapy in a chronic condition. Many are seeing the values recognized by payers as recognized recently by ICER. So clearly, the models are out there. But we won't comment on our competitors' pricing. We don't obviously have any privy to that. We believe that we are leaders in establishing value and setting price for these therapies, and we will continue to price the way that we price.

Then, Defendant Obenshain stated the following:

> ***And then, Luca, just on the safety issues. As a reminder, there have been no cases of insertional oncogenesis with lovo-cel. However, there have been cases of cancer related to the transplant procedure involving lovo-cel. And unfortunately, 2 of those patients in our early clinical trials where we – our procedures were in the earlier phase of Generation 1 procedure since the Group A did develop leukemia and AML, and those 2 patients did pass away. So although they are not -- those 2 patients are not in our efficacy data set, it is likely that we will have a mention of that in the safety events in the label. In what part of the label or where is yet to be determined, but certainly, they will be in there. That's something that we've known for quite a while.***
>
> ***Again, I think the really important point is there are no cases of insertional oncogenesis. And so these are cases that were related to the procedure.***

112. The statements referenced in ¶¶ 93 and 105-111 were materially false and misleading because the Individual Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about bluebird's business, operations, and compliance policies. Specifically, the Individual Defendants made false and/or misleading statements and/or

failed to disclose, *inter alia*, that: (1) the FDA would not approve lovo-cel gene therapy without a black box warning for haematological malignancies; (2) the Company would not obtain a priority review voucher from the FDA for lovo-cel and, consequently, could not sell lovo-cel to reinforce bluebird's financial position before lovo-cel débuted; (3) as a result, Lyfgenia's commercial and/or clinical forecasts were materially exaggerated and overstated; (4) the Company failed to maintain internal controls; and (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2023 Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

***December 8, 2023 Press Release***

113. On December 8, 2023, the truth emerged when the Company published a press release stating the FDA approved Lyfgenia, a drug for its ex-vivo gene therapy for SCD. However, this approval also came with a "black-box" warning for haematological malignancies and requirements to monitor patients for cancer through complete blood counts in at least six month intervals for a minimum 15 years. On top of the approval and black-box warning, the FDA denied the Company's anticipated priority review voucher. In relevant part, the press release stated:

> bluebird bio, Inc. (Nasdaq: BLUE) ("bluebird bio" or "bluebird") today announced the U.S. Food and Drug Administration (FDA) has approved LYFGENIA™ (pronounced as 'lif-JEN-ee uh') (lovotibeglogene autotemcel), also known as lovo-cel, for the treatment of sickle cell disease in patients ages 12 and older who have a history of vaso-occlusive events (VOEs). LYFGENIA is a onetime gene therapy that has the potential to resolve vaso-occlusive events and is custom-designed to treat the underlying cause of sickle cell disease.
>
> "Bringing LYFGENIA to people living with sickle cell disease is a milestone that bluebird has been working toward for almost a decade—and one that members of the sickle cell disease community have been waiting on for much longer," said Andrew Obenshain, chief executive officer, bluebird bio. "LYFGENIA has the

potential to have a transformational impact for patients who currently live under the shadow of unpredictable and debilitating vaso-occlusive events. This approval also marks bluebird's third *ex vivo* gene therapy approved by the FDA for a rare genetic disease and second FDA approval for an inherited hemoglobin disorder, cementing our position as a gene therapy leader."

"We're enthusiastic at the Sickle Cell Disease Association of America Inc. about the FDA's approval of this therapy, which could change the lives of people and families affected by sickle cell disease," said Regina Hartfield, president and CEO of the Sickle Cell Disease Association of America Inc. "As the national advocacy organization for people with sickle cell, we're strongly supportive of the new potentially curative option for treatment and excited for the future."

"People living with sickle cell disease face potentially devastating health consequences, diminished quality of life, and harmful stigma as a result of their disease," said Julie Kanter, M.D., a LYFGENIA investigator and director of the University of Alabama Birmingham Adult Sickle Cell Clinic and associate professor in the Division of Hematology and Oncology. "Today we can celebrate the availability of a potentially transformative new therapeutic option made possible by the incredible courage of patients and families who participated in clinical studies."

***

LYFGENIA was granted Priority Review in June 2023. ***The Company did not receive a Rare Pediatric Disease Priority Review Voucher as part of the review.*** LYFGENIA was previously granted orphan drug designation, fast track designation, regenerative medicine advanced therapy (RMAT) designation, and rare pediatric disease designation.

**Clinical Data Supporting Approval of LYFGENIA** The FDA approval of LYFGENIA builds on decades of research into lentiviral vector gene addition therapy and the largest clinical development program of any gene therapy for sickle cell disease.

The label is based on data from patients from the Phase 1/2 HGB-206 study. Safety data supporting the application includes data from 54 patients who initiated stem cell collection. Efficacy for LYFGENIA was supported by data from 36 patients in the Phase 1/2 HGB-206 Group C study following enhancements to the treatment and manufacturing processes made through the course of the clinical development program. 32 patients were evaluable for the endpoints of complete resolution of VOEs and severe VOEs in the 6-18 months post-infusion including 8 adolescent patients. In this cohort:

- Severe vaso-occlusive events were resolved in 30/32 patients (94%)
- 28/32 patients (88.2%) experienced no vaso-occlusive events at all

> In the studies, VOEs are defined as episodes of acute pain with no medically determined cause other than a vaso-occlusion, lasting more than two hours and severe enough to require care at a medical facility. This includes acute chest syndrome requiring oxygen treatment and/or blood transfusion, acute hepatic sequestration, acute priapism lasting 2 hours and requiring care at a medical facility and acute splenic sequestration. sVOEs require a 24-hour hospital stay or emergency room visit, or at least two visits to a hospital or emergency room over a 72-hour period, with both visits requiring intravenous treatment; all VOEs of priapism are also considered sVOEs.
>
> The most common adverse reactions ≥ Grade 3 (incidence ≥ 20%) were stomatitis, thrombocytopenia, neutropenia, febrile neutropenia, anemia, and leukopenia. ***As previously reported, three patients died during LYFGENIA clinical trials; one from sudden cardiac death due to underlying disease and two from acute myeloid leukemia who were treated with an earlier version of LYFGENIA using a different manufacturing process and transplant procedure. Please see LYFGENIA Important Safety Information below, including a Boxed Warning for Hematologic Malignancy.***
>
> ***Patients treated with LYFGENIA in bluebird bio-sponsored clinical studies will be monitored for a total of 15 years through a long-term safety and efficacy follow-up study (LTF-307).***

114. On this same day, the FDA approved a competitor's drug without a black box warning. Specifically, the FDA approved Vertex Pharmaceuticals' SCD drug called Casgevy, for patients 12 years and older, but without the black box warning that Lyfgenia came with.

***December 8, 2023 Earnings Call***

115. Additionally, on December 8, 2023, the Company held an earnings conference call, During the call, Eric William Joseph , a analyst from JP Morgan Chase & Co.'s Research Division, asked Defendant Colvin about the black box warning on Lyfgenia. Defendant Colvin answered the questions, in relevant part:

> Yes. Thanks, Andrew, and thanks, Eric. And so as we've reported before, hematologic malignancy has occurred in patients who receive LYFGENIA in clinical studies. This is an important risk that all patients must be aware of, counseled on and -- if they're considering getting gene therapy.
>
> One thing to remember, though, that's very important is that there have been no cases of insertional oncogenesis that have been observed and that this risk of this

> type of malignancy is not unique to LYFGENIA. The AML case that occurred in our studies used a process to manufacture the cells that we no longer use. And we characterize it very carefully in the medical and scientific literature. And we've talked about it with the physician community, the QTC community, and we published it in the New England Journal of Medicine. In fact, what we've learned from our program have informed not only the development program for LYFGENIA, but the broader gene therapy field, especially in sickle cell disease. ***The potential for a box warning was something we anticipated and it was built into our commercial projections.***

116. The market reacted with surprise to these revelations about Lyfgenia's quick approval by the FDA. A J.P. Morgan analyst dropped their price target for bluebird, reasoning that "…While Lyfgenia's early approval is a welcome upside surprise (original PDUFA date Dec 20), the inclusion of a black box warning for hematological malignancies and the absent pairing of a priority review voucher arrive short of expectations. Of note, we do not see the inclusion of a black box warning impeding the overall competitiveness of Lyfgenia; however, we concede that it is unexpected give the lack of adcom during the review cycle…"

117. Another analyst from Cantor Fitzgerald discussed the Company's inability to retrieve a priority review voucher: "we speculate that because BLUE already received a PRV on Zynteglo, a closely related therapy for beta thalassemia, the FDA may have viewed BLUE's request as double-dipping. . . ." Moreover, Cantor Fitzgerald mentioned that the drug would need extra monitoring, stating " . . . [m]onitoring includes a blood assessment every six months for 15 years, a requirement not present for Casgevy. Patients are thus likely to prefer Casgevy when given an option, as these therapies are 'one and done.'"

118. On this news, the price of the Company's common stock declined from a closing market price of $4.81 per share on December 7, 2023 to $2.86 per share on December 8, 2023, marking a drop of ***approximately 41%***.

## DAMAGES TO BLUEBIRD

119. As a direct and proximate result of the Individual Defendants' conduct, bluebird has lost and expended, and will continue to lose and expend, many millions of dollars.

120. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

121. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

122. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

123. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including but not limited to payments made to the Individual Defendants pursuant to the 2023 Incentive Plan.

124. As a direct and proximate result of the Individual Defendants' conduct, bluebird has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment,

waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

## DERIVATIVE ALLEGATIONS

125. Plaintiff brings this action derivatively and for the benefit of bluebird to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of bluebird, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

126. bluebird is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

127. Plaintiff is, and has been at all relevant times, a shareholder of bluebird. Plaintiff will adequately and fairly represent the interests of bluebird in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

128. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

129. A pre-suit demand on the Board of bluebird is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Obenshain, Agwunobi, Jones, Leiderman, Leschly, Paulson, Tita, and Vachon (the "Director-Defendants") and non-party Michael Cloonan (collectively with the Director-Defendants, the

"Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

130. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

131. As Board members of bluebird charged with overseeing the Company's affairs, all of the Director-Defendants must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of bluebird, the Director-Defendants must have been aware of the material facts regarding the issues plaguing bluebird's internal controls and communications with the FDA.

132. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted bluebird to issue materially false and misleading statements. Specifically, the Director-Defendants caused bluebird to issue false and misleading statements which were intended to make bluebird appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

133. In addition, Defendants Obenshain, Agwunobi, Jones, Leiderman, Leschly, Paulson, Tita and Vachon caused the 2023 Proxy Statement to call for a shareholder vote to

approve the 2023 Incentive Plan, which provided for the grant of stock and stock option awards for officers and directors, including each of the Director-Defendants. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2023 Incentive Plan who would not have approved the 2023 Incentive Plan, had they been informed about the Individual Defendants' misconduct. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

134. Moreover, Director-Defendants Obenshain, Jones, Leiderman, Leschly, Vachon, Agwunobi, and Tita have received material personal benefits pursuant to the 2023 Incentive Plan between June 2023, when the 2023 Incentive Plan was approved by way of the false and misleading 2023 Proxy Statement, and June 27, 2024, the date that this action was filed. The specific awards of stock options and shares of common stock to the Director-Defendants directly linked to the 2023 Incentive Plan are disclosed in Marathon's Form 3s and 4s and/or its proxies filed with the SEC and include (at least) the following:

**AMOUNTS RECEIVED UNDER THE 2023 INCENTIVE PLAN**[5]

| Individual | Date | Stock Options/ Shares of Common Stock Awarded | Conversion Price per share of Derivative Security (as noted in Form 4) |
|---|---|---|---|
| ***Andrew Obenshain***, defendant, CEO, President | **03/01/2024** | 650,000 (options) | $1.56 |
| | **TOTAL awarded:** | **650,000 (options)** | |
| ***Charlotte Jones-Burton***, defendant, Director | **06/16/2023** | 21,600 (options) | $3.81 |
| | **06/16/2023** | 10,790 (shares) | N/A |

[5] Includes amounts received under the 2023 Incentive Plan by the Director-Defendants between June 16, 2023, the date that the shareholder-approved 2023 Incentive Plan went into effect, to June 27, 2024, the date that this action was filed.

| | | | |
|---|---|---|---|
| | **TOTAL awarded:** | **21,600 (options); 10,790 (shares)** | |
| ***Elisabeth Leiderman***, defendant, Director | **06/16/2023** | 21,600 (options) | $3.81 |
| | **06/16/2023** | 10,790 (shares) | N/A |
| | **TOTAL awarded:** | **21,600 (options); 10,790 (shares)** | |
| ***Nick Leschly***, defendant, Director | **06/16/2023** | 21,600 (options) | $3.81 |
| | **06/16/2023** | 10,790 (shares) | N/A |
| | **TOTAL awarded:** | **21,600 (options); 10,790 (shares)** | |
| ***Mark Vachon***, defendant, Director | **06/16/2023** | 21,600 (options) | $3.81 |
| | **06/16/2023** | 10,790 (shares) | N/A |
| | **TOTAL awarded:** | **21,600 (options); 10,790 (shares)** | |
| ***John O Agwunobi***, defendant, Director | **06/16/2023** | 21,600 (options) | $3.81 |
| | **06/16/2023** | 10,790 (shares) | N/A |
| | **TOTAL awarded:** | **21,600 (options); 10,790 (shares)** | |
| ***Najoh Tita-Reid***, defendant, Director | **06/16/2023** | 21,600 (options) | $3.81 |
| | **06/16/2023** | 10,790 (shares) | N/A |
| | **TOTAL awarded:** | **21,600 (options); 10,790 (shares)** | |

135. Additional reasons that demand on Defendant Obenshain is futile follow. Defendant Obenshain has been a director of the Company since 2021 and has served as the Company's President and CEO since November 2021. Defendant Obenshain has received and continues to receive handsome compensation for his role as CEO, President, and as a Company director. In addition, Defendant Obenshain solicited the 2023 Proxy Statement, which led to the reelection of Defendants Jones and Vachon to the Board, allowing them to continue breaching

their fiduciary duties to the Company and to the approval of the 2023 Incentive Plan. As a trusted-long time Company director and the Company's highest officer, he is personally responsible for all of the false and misleading statements alleged herein and he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2023 Incentive Plan, Defendant Obenshain is eligible to receive stock awards under the 2023 Incentive Plan, has received various amounts of stock awards under the 2023 Incentive Plan, and will receive material amounts of stock awards under the 2023 Incentive Plan in the future, thereby materially benefiting from the adoption of the 2023 Incentive Plan. Furthermore, he engaged in lucrative insider trading obtaining personal profits of approximately $62,516. For these reasons, too, Defendant Obenshain breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

136. Additional reasons that demand on Defendant Agwunobi is futile to follow. Defendant Agwunobi has served as a Company director since June 8, 2017. He also serves as the Chair of the Nominating and Corporate Governance Committee and a member of the Audit Committee. Defendant Agwunobi received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Agwunobi solicited the 2023 Proxy Statement, which led to the reelection of Defendants Jones and Vachon to the Board, allowing them to continue breaching their fiduciary duties and to the approval of the 2023 Incentive Plan. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously

disregarded his duties to protect corporate assets. Moreover, under the 2023 Incentive Plan, Defendant Agwunobi is eligible to receive stock awards under the 2023 Incentive Plan, has received various amounts of stock awards under the 2023 Incentive Plan, and will receive material amounts of stock awards under the 2023 Incentive Plan in the future, thereby materially benefiting from the adoption of the 2023 Incentive Plan. For these reasons, too, Defendant Agwunobi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

137. Additional reasons that demand on Defendant Jones is futile follow. Defendant Jones has served as a Company director since March 4, 2022. She also serves as a member of the Nominating and Corporate Governance Committee. Defendant Jones has received and continues to receive handsome compensation for her role as Company director. In addition, Defendant Jones solicited the 2023 Proxy Statement, which led to the reelection of herself and Defendant Vachon to the Board, allowing herself and Defendant Vachon to continue breaching their fiduciary duties to the Company and to the approval of the 2023 Incentive Plan. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2023 Incentive Plan, Defendant Jones is eligible to receive stock awards under the 2023 Incentive Plan, has received various amounts of stock awards under the 2023 Incentive Plan, and will receive material amounts of stock awards under the 2023 Incentive Plan in the future, thereby materially benefiting from the adoption of the 2023 Incentive Plan. For these reasons, too, Defendant Jones breached her fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

138. Additional reasons that demand on Defendant Leiderman is futile follow. Defendant Leiderman has served as a Company director since October 15, 2021. She also serves as the Chair of the Audit Committee and a member of the Compensation Committee. Defendant Leiderman has received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Leiderman solicited the 2023 Proxy Statement, which led to the reelection of Defendants Jones and Vachon to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2023 Incentive Plan. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2023 Incentive Plan, Defendant Leiderman is eligible to receive stock awards under the 2023 Incentive Plan, has received various amounts of stock awards under the 2023 Incentive Plan, and will receive material amounts of stock awards under the 2023 Incentive Plan in the future, thereby materially benefiting from the adoption of the 2023 Incentive Plan. For these reasons, too, Defendant Leiderman breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

139. Additional reasons that demand on Defendant Leschly is futile follow. Defendant Leschly has served as a Company director since October 2010. He served as President and CEO from October 2010 until November 2021. Defendant Leschly has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Leschly

solicited the 2023 Proxy Statement, which led to the reelection of Defendants Jones and Vachon to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2023 Incentive Plan. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2023 Incentive Plan, Defendant Leschly is eligible to receive stock awards under the 2023 Incentive Plan, has received various amounts of stock awards under the 2023 Incentive Plan, and will receive material amounts of stock awards under the 2023 Incentive Plan in the future, thereby materially benefiting from the adoption of the 2023 Incentive Plan. For these reasons, too, Defendant Leschly breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

140. Additional reasons that demand on Defendant Paulson is futile to follow. Defendant Paulson has served as a Company director since April 3, 2023. In addition, Defendant Paulson solicited the 2023 Proxy Statement, which led to the reelection of Defendants Jones and Vachon to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2023 Incentive Plan. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2023 Incentive Plan, Defendant Paulson is eligible to receive stock awards under the 2023 Incentive Plan, has received various amounts of stock awards under the 2023

Incentive Plan, and will receive material amounts of stock awards under the 2023 Incentive Plan in the future, thereby materially benefiting from the adoption of the 2023 Incentive Plan. For these reasons, too, Defendant Paulson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

141. Additional reasons that demand on Defendant Tita is futile follow. Defendant Tita has served as a Company director since September 29, 2021. She also serves as a member of the Compensation Committee and a member of the Nominating and Corporate Governance Committee. Defendant Tita has received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Tita solicited the 2023 Proxy Statement, which led to the reelection of Defendants Jones and Vachon to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2023 Incentive Plan. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2023 Incentive Plan, Defendant Tita is eligible to receive stock awards under the 2023 Incentive Plan, has received various amounts of stock awards under the 2023 Incentive Plan, and will receive material amounts of stock awards under the 2023 Incentive Plan in the future, thereby materially benefiting from the adoption of the 2023 Incentive Plan. For these reasons, too, Defendant Tita breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

142. Additional reasons that demand on Defendant Vachon is futile follow. Defendant Vachon has served as a Company director since July 2014. He also has served as Chairman of the Board since November 2021 and serves as a member of the Audit Committee and as the Chair of the Compensation Committee. Defendant Vachon has received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Vachon solicited the 2023 Proxy Statement, which led to the reelection of Defendant Jones and himself to the Board, allowing them to continue breaching their fiduciary duties to the Company and to the approval of the 2023 Incentive Plan. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2023 Incentive Plan, Defendant Vachon is eligible to receive stock awards under the 2023 Incentive Plan, has received various amounts of stock awards under the 2023 Incentive Plan, and will receive material amounts of stock awards under the 2023 Incentive Plan in the future, thereby materially benefiting from the adoption of the 2023 Incentive Plan. For these reasons, too, Defendant Vachon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143. Additional reasons that demand on the Board is futile follow.

144. Defendants Leiderman (as current Chair), Agwunobi, and Vachon (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. Defendant Leiderman was the Chair of the Audit Committee during the Relevant Period. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable

laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

145. All the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

146. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

147. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

148. The acts complained of herein constitute violations of fiduciary duties owed by bluebird's officers and directors, and these acts are incapable of ratification.

149. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of bluebird. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of bluebird, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

150. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause bluebird to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

151. Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
**Against the Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

152. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

153. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

154. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

155. Under the direction and watch of the Individual Defendants, the 2023 Proxy Statement failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

156. Under the direction and watch of the Individual Defendants, the 2023 Proxy Statement failed to disclose that: (1) the FDA would not approve lovo-cel gene therapy without a black box warning for haematological malignancies; (2) the Company would not obtain a priority review voucher from the FDA for lovo-cel and, consequently, could not sell lovo-cel to reinforce bluebird's financial position before lovo-cel débuted; (3) as a result, Lyfgenia's commercial and/or clinical forecasts were materially exaggerated and overstated; (4) the Company failed to maintain internal controls; and (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2023 Incentive Plan.

157. In the exercise of reasonable care, the Individual Defendants knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement including, but not limited to, the re-election of Defendants Jones and Vachon to the Board; the appointment of EY as the Company's independent registered public accounting firm for the 2023 Fiscal Year; the approval, on a non-binding, advisory basis, of the compensation paid to the Company's named executive officers; the

approval of an amendment to the Company's Amended and Restated Certificate of Incorporation to increase the number of authorized shares of the Company's common stock; and the approval of the 2023 Incentive Plan.

158. As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders voted, *inter alia*, to re-elect and Defendants Jones and Vachon to the Board, thus allowing them to continue breaching their fiduciary duties to bluebird and to approve the 2023 Incentive Plan, which the Individual Defendants have personally benefited from.

159. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

160. Plaintiff, on behalf of bluebird, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

161. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

162. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of bluebird's business and affairs.

163. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

164. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of bluebird.

165. In breach of their fiduciary duties owed to bluebird, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading

statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the FDA would not approve lovo-cel gene therapy without a black box warning for haematological malignancies; (2) the Company would not obtain a priority review voucher from the FDA for lovo-cel and, consequently, could not sell lovo-cel to reinforce bluebird's financial position before lovo-cel débuted; (3) as a result, Lyfgenia's commercial and/or clinical forecasts were materially exaggerated and overstated; (4) the Company failed to maintain internal controls; and (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2023 Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

166. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

167. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

168. In yet further breach of their fiduciary duties, during the Relevant Period, three of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $89,930.

169. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard

for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of bluebird's securities.

170. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of bluebird's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

171. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

172. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, bluebird has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

173. Plaintiff, on behalf of bluebird, has no adequate remedy at law.

## THIRD CLAIM
## Against the Individual Defendants for Unjust Enrichment

174. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

175. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, bluebird.

176. The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from bluebird that was tied to the performance or artificially inflated valuation of bluebird, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

177. Plaintiff, as a shareholder and a representative of bluebird, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation and any compensation received under and/or pursuant to the 2023 Incentive Plan, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

178. Plaintiff, on behalf of bluebird, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

179. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

180. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused bluebird to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

181. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

182. Plaintiff, on behalf of bluebird, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

183. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

184. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of bluebird in a manner consistent with the operations of a publicly held corporation.

185. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, bluebird has sustained and will continue to sustain significant damages.

186. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

187. Plaintiff, on behalf of bluebird, has no adequate remedy at law.

**SIXTH CLAIM**
**Against the Individual Defendants for Abuse of Control**

188. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

189. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence bluebird, for which they are legally responsible.

190. As a direct and proximate result of the Individual Defendants' abuse of control, bluebird has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

191. Plaintiff, on behalf of bluebird, has no adequate remedy at law.

**SEVENTH CLAIM**

**Against Defendants Obenshain, Krawtschuk, and Colvin for Contribution Under Sections 10(b) and 21D of the Exchange Act**

192. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

193. bluebird and Defendants Obenshain, Krawtschuk, and Colvin are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Obenshain's, Krawtschuk's, and Colvin's willful and/or reckless violations of their obligations as officers and/or directors of bluebird.

194. Defendants Obenshain, Krawtschuk, and Colvin, because of their positions of control and authority as officers and/or directors of bluebird, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of bluebird, including the wrongful acts complained of herein and in the Securities Class Action.

195. Accordingly, Defendants Obenshain, Krawtschuk, and Colvin are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

196. As such, bluebird is entitled to receive all appropriate contribution or indemnification from Defendants Obenshain, Krawtschuk, and Colvin.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of bluebird, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to bluebird;

(c) Determining and awarding to bluebird the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing bluebird and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect bluebird and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;
2. a provision to permit the shareholders of bluebird to nominate at least four candidates for election to the Board; and
3. a proposal to ensure the establishment of effective oversight of compliance

with applicable laws, rules, and regulations;

(e) Awarding bluebird restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: June 27, 2024

**THE BROWN LAW FIRM, P.C.**

*/s/ John Coyle IV*
John Coyle IV
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: jcoyle@thebrownlawfirm.net
tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

**VERIFICATION**

I, Mantas Šimaitis, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24__ day of June, 2024.

DocuSigned by:
Mantas Šimaitis
429E41BE0AFF4E5...
Mantas Šimaitis